## COMMONWEALTH vs. KEVIN THOMAS.

No. 99-P-1470.

Suffolk. May 8, 2001. - August 16, 2001.

Present: BROWN, JACOBS, & McHUGH, JJ.

*Practice, Criminal,* Argument by prosecutor. *Controlled Substances. Evidence, Inference.*

At the trial of indictments charging possession of cocaine with intent to distribute and possession in a school zone with intent to distribute, in which, apart from the defendant's association with the driver of an automobile and his presence in the back seat of the vehicle, there was nothing in the evidence, let alone a preponderance of that evidence, to support a reasoned inference that the defendant knew of or had access to drugs or a scale in the front seat, the judge, in view of the argument and the defendant's timely and appropriate objections, erred by failing to limit the inferential value of the scale and the drugs. [289-293]

COMPLAINT received and sworn to in the Dorchester Division of the District Court Department on December 18, 1998.

The case was tried before *Sarah B. Singer*, J.

*Astrid H. afKlinteberg* for the defendant.

*Brian J.S. Cullen*, Assistant District Attorney, for the Commonwealth.

McHUGH, J. Claiming that the prosecutor's closing argument improperly urged the jury to adopt a theory of guilt by association, the defendant appeals from his convictions of possession of a Class B substance (cocaine) with intent to distribute, G. L. c. 94C, § 32A(*a*), and possession of a Class B substance (same cocaine) in a school zone with intent to distribute. G. L. c. 94C, § 32J. We conclude that the trial judge's instructions did not palliate the problem the argument created; therefore, we reverse the convictions and remand the matter for a new trial.

In her closing, the prosecutor urged the jury to draw inferences adverse to the defendant from his presence, along with

three other individuals, in an automobile where police found a digital scale and drugs other than those forming the basis for the charges against the defendant. That exhortation built upon evidence which made the Commonwealth's case plausible but quite close when the material components are considered. In essence, the evidence was as follows: One evening in December, 1998, Boston police Detective Kevin McGill was on routine patrol with his partner, Robert Smith. While on patrol, McGill noticed the automobile in which the defendant was riding. Intuition borne of experience led McGill to seek information from the Registry of Motor Vehicles (registry) about the automobile's registration. While the registry was processing McGill's request, the officers followed the automobile as it proceeded to a nearby Burger King and watched as the occupants bought some hamburgers.

Shortly after the vehicle left the Burger King, the registry informed McGill that its license plates had been stolen.[1] McGill consequently called for assistance and, together, the assembled officers stopped the automobile on Brunswick Street in the Roxbury section of Boston.

After the stop, McGill, accompanied by another officer, approached the driver's side of the vehicle while Smith approached the passenger side. The officers saw four people in the automobile: a male driver, a female in the front passenger seat, the defendant in the rear seat behind the driver, and a young girl approximately four years of age in the rear seat behind the female.

McGill, who was in plain clothes, identified himself to the driver as a police officer and asked for a license and registration. In virtually the same breath, McGill told all four occupants to "show [their] hands." The defendant, the young girl, and the female all complied by raising their hands in the air. The driver, however, kept his hands down where McGill could not see them. Concerned for his safety and seeking to underscore the firmness of his request, McGill drew his service revolver and again told the driver to place his hands in plain view. The driver

---

[1] Ultimately, it turned out that the automobile, too, had been stolen, apparently from someone other than the person from whom the plates had been taken.

not only failed once more to comply but began to push something under the front seat beneath him. As he did, the defendant and the other two passengers sat there, hands in the air.

Plainly unhappy with the driver's response, McGill and another officer attempted to extricate him from the car. A struggle ensued. As the struggle progressed and the defendant sat watching with his hands in the air, another police officer at the scene, Lt. Gary French, took the defendant by the arm and escorted him from the automobile's back seat to a nearby sidewalk. French, the defendant, and another officer then stood together on the sidewalk while the struggle between the driver and the officers wound down, the driver was arrested and police began a search of the automobile. That search quickly revealed a digital scale beneath the driver's seat and an unstated quantity of "narcotics," not otherwise described at trial, in some kind of a container located between the accelerator and the brake pedal.

After about fifteen minutes, McGill asked the defendant, who was still standing near French and the other officer, to come with him. The defendant complied.[2] After the defendant left the sidewalk in McGill's company, French looked down and saw a plastic bag containing eleven or twelve small tin-foil packages lying on the sidewalk in the spot where the defendant had been standing. Subsequent analysis showed that the packages contained a total of 2.4 grams of "crack" cocaine. That is the cocaine the defendant was charged with possessing.

At trial, Detective James Freeman, a Boston police officer whom the Commonwealth called as a narcotics expert, testified that the Brunswick Street area where the defendant was arrested was in an area where he had made "a hundred" arrests during the course of his career. The majority of those arrests were for drugs. He also testified that a "dime bag" is a package of cocaine containing an individual consumption unit having a value of ten dollars and that the plastic bag French found on the

---

[2]When the two reached the vicinity of the automobile, McGill asked the defendant questions about the driver's identity. Upon receiving unsatisfactory answers, McGill arrested the defendant for "proceeding in a stolen motor vehicle." It is not clear what happened to that charge thereafter but no variant of it was pressed at the trial.

sidewalk contained eleven or twelve "dime bags."[3] On cross-examination, he added that cocaine "addicts" typically bought one "dime bag" at a time.

When the prosecutor asked Freeman how one could distinguish between a buyer and a seller of narcotics, Freeman said, "You are going to look for packaging material, beepers, cell phones, scales, it is things that we consider tools of the business." In response to the prosecutor's next question, Freeman said that, based on his training and experience, the scale was "significant" because

> "if you had a scale, you could weigh out what you would be packaging in the sale, what is going to be received to make sure that you don't get beat by the guy that is selling it to you[,] to make sure [it's] the right amount that you paid for."

A scale, in other words, was useful both to buyers and to sellers.

That was the evidentiary backdrop for both closing arguments. In his argument, the defendant employed a two-pronged approach to urging the insufficiency of the Commonwealth's evidence. First he argued that he had no relationship with, much less possession of, the drugs French testified he found on the sidewalk.[4] Second, the defendant argued that, even if the jury were persuaded that the sidewalk narcotics were his, nothing connected him to, or showed he even knew of, the drugs and

---

[3]Additionally, Freeman said that a "dime bag" usually contained .1 grams of cocaine and suggested that an individual consumption unit could cost as much as $20.00. In her argument, the prosecutor asserted, without objection, that the bag French said he found on the sidewalk contained twenty-four times the amount used for personal consumption.

[4]In so doing, he drew upon evidence that French had escorted the defendant from the automobile's back seat to the nearby sidewalk. There, French, who testified that he had carefully looked and had seen nothing on the sidewalk the defendant could use as a weapon, conducted a "thorough pat frisk . . . for weapons." The "pat frisk" revealed no weapons. When the frisk was concluded, someone handcuffed the defendant. (The evidence on that point was somewhat ambiguous. French testified that he had not handcuffed the defendant but did not recall whether or not someone else had done so. McGill, however, testified that the defendant was handcuffed when he asked him to leave the sidewalk). The trio then stood together on the sidewalk until the defendant left at McGill's request. As stated, after the defendant left, French observed drugs on what he said was the previously barren sidewalk.

scale in the automobile. As a result, he urged that nothing in the evidence was sufficient to persuade the jury beyond a reasonable doubt that the sidewalk narcotics were a sales inventory instead of a stash intended for his own personal use.

To advance his second prong, defense counsel began the closing portion of his argument by telling the jury, in essence, that the police had overcharged the defendant because of their view that "there is a bad guy in the front seat [and] we have to do something about it." In context, there can be little doubt that the quoted portion of the argument attributed to police a belief that the driver was a "bad guy" as a foundation for defense counsel's theory that the police had simply swept up the defendant in their effort to deal vigorously with the driver.

To the prosecutor, however, the words "bad guy" were an orchard ripe for the picking. She began her argument as follows:

> "The Commonwealth does not disagree with defense counsel's characterization of the bad guy sitting in the front seat of the car. I ask you all to remember though that the defendant was sitting in the same car. He was sitting behind that bad guy in the front seat, sitting right behind him in the back seat, behind that bad guy."

That drew an objection from defense counsel. In the resulting sidebar discussion, counsel said that the prosecutor was arguing guilt by association. The judge overruled the objection and said nothing to the jury, and the prosecutor's summation continued.

The prosecutor did not use the words "bad guy" again. She ended her argument, though, with the following salvo:

> "The Commonwealth is asking you to put it all together and to use your common sense. . . . What were these people doing? Driving around, eight o'clock, eight-thirty at night, crack cocaine[5] and a scale in the car, what were they doing, use your common sense, what do you think

---

[5] If this was a reference to the sidewalk drugs, then the reference illustrates the problem discussed below, for it closely links those drugs to the scale. If this was a reference to the automobile drugs, then the reference was without foundation, for, as stated earlier, there was no evidence about the kind of drugs the automobile contained.

they were doing [w]ith a scale[. A]nd where did they say that they found it, they found the scale and they found drugs on the front floor of . . . where the driver was, they found the scale, they found drugs. That is what the testimony is. What were they doing? Use your common sense, driving around with drugs and a scale. There was no promise that you could see all the conditions of drug sales, no promise of that, but what did you see, you did see drugs, more than personal use according to the expert's testimony, we have a scale. . . . [Y]ou do have drugs more than personal use and you do have a scale that was found. . . . The Commonwealth suggests to you that if you use your common sense and put it altogether, look at the facts of the testimony, look at the drugs, think back on the expert's testimony about personal use, think about the testimony that you have here, if you put it all together and you use your common sense, the Commonwealth believes that there is evidence there and that you could absolutely find this defendant guilty as he is charged. Thank you very much."

That volley produced another objection from defendant, this one accompanied by a motion for a mistrial on several grounds. First, that nothing in the evidence tied the defendant to the scale or to the drugs found in the car; second, the prosecutor's argument suggested that the defendant knew before his arrest about the scale and front-seat drugs; and last, nothing in the evidence supported the notion that the defendant was "driving" around town or otherwise dictating the route the automobile had taken. In sum, counsel argued, the prosecutor's argument was a classic invitation to find the defendant guilty because he was associated with the car's driver and with the scale and drugs the driver clearly controlled.

The judge overruled the objection and denied the motion for a mistrial. During her ensuing instructions, she said nothing to the jury about any limits on the jurors' power to draw inferences regarding the defendant's intent from the presence of the drugs and the scale in the front of the automobile.[6]

Because the defendant objected at every step, he preserved

---

[6]The trial judge also denied the defendant's request for a specific instruction on the general subject of guilt by association. In the colloquy during which she denied the defendant's motion and his request for that instruction,

all of his objections to the prosecution's argument. We therefore review the judge's ruling on those objections to determine whether there was prejudicial error. *Commonwealth* v. *Freeman*, 430 Mass. 111, 115 (1999). There was.

First, although both prosecution and defense are free to argue the evidence and the fair inferences from it, *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 416 (1978), "[t]he Commonwealth's best case may not rely upon inference piled upon inference." *Commonwealth* v. *Nicholas*, 40 Mass. App. Ct. 255, 257-258 (1996). While that principle is usually employed to determine whether the Commonwealth's evidence was sufficient to warrant a conviction, it applies with equal force here. In the absence of any direct evidence that the defendant knew of and had access to the scales and the drugs in the front of the car, the Commonwealth's argument urged the jury first to infer that he had that knowledge and access and then to draw from that inference an inference regarding his intended disposition of the drugs French testified he found on the sidewalk.

Second, and more importantly, the evidence did not support the inference that defendant had access to or even knew of the drugs and the scale in the automobile. The car was stolen. The defendant was not the driver. The drugs and scale were on the floor in the front. The defendant was in the back. The driver tried to hide the scale while the defendant sat in the back with his hands in the air. The driver struggled with police; the

---

the judge did say that she would instruct the jury (1) that proof of presence in the vicinity of a controlled substance, even with knowledge that the substance was there, is insufficient to prove possession of the substance; (2) that possession of cocaine is not "proved simply because the defendant was associated with the person who controlled the cocaine or where the cocaine was found"; (3) that the defendant was not charged with possession of the "cocaine" found in the automobile; and (4) that the defendant was not charged with any conduct in which other occupants of the automobile had engaged. Faithful to her commitment, she gave those instructions. They did not meet, however, the objection defense counsel had made, i.e., in the absence of any evidence suggesting that the defendant knew about the scale or the otherwise undescribed front-seat "drugs," it was inappropriate to draw any adverse inference about his intent simply from his association with the driver and the driver's manifest possession of the scale and the drugs. Indeed, while instruction (2) would have been appropriate if the defendant had been charged with possessing the drugs found in the car, instruction (3) correctly told the jury that he had not been so charged. The defendant did not object to the instructions the judge gave nor has he raised on appeal any issues regarding those instructions.

defendant readily complied with their requests and commands. There was no demonstrated similarity between the drugs in the car and the crack cocaine French testified he found on the sidewalk. Contrast, e.g., *Commonwealth* v. *James*, 30 Mass. App. Ct. 490, 495-497 (1991). Indeed, the evidence was devoid of any description of the type, quantity, or quality of the drugs police discovered on the driver's-side floor. Before stopping the car, police had watched the occupants stocking up on hamburgers, not trolling for customers. Thus, apart from the defendant's association with the driver and his presence in the car, there was nothing in the evidence, let alone a preponderance of that evidence, *Commonwealth* v. *Rosenthal*, 432 Mass. 124, 127 n.4 (2000), to support a reasoned inference that the defendant knew of or had access to the front-seat scale or drugs. See generally, e.g., *Commonwealth* v. *Cormier*, 41 Mass. App. Ct. 76, 79-80 (1996); *Commonwealth* v. *Avery*, 44 Mass. App. Ct. 781, 783 (1998); *Commonwealth* v. *Aiello*, 49 Mass. App. Ct. 496, 498 (2000); *Commonwealth* v. *Brown*, 50 Mass. App. Ct. 253, 258 (2000). Instead, there was association, pure and simple. But association is a fundamentally impermissible basis on which to urge an inference of guilt. See *Commonwealth* v. *Lombard*, 419 Mass. 585, 592 n.6 (1995). In view of the argument and the defendant's timely and appropriate objections, the trial judge erred by failing to make that clear and by failing to sharply limit the inferential value of the scale and the automobile drugs.

It cannot fairly be said that the error was harmless. Yes, even when stripped of impermissible inferences, there was enough in the evidence to send the case to the jury and to warrant conviction. But there was barely enough and for presumptively responsible fact finders the case surely was close. Under those circumstances, we cannot say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). The conviction therefore cannot stand.

In light of the foregoing, the judgments are reversed, the verdicts are set aside, and the case is remanded for a new trial.

*So ordered.*